The third and final case this morning for argument is 13-1255 TRK Canada v. United States. This decision needs to be reversed because it violates well-settled precedent that tariff terms have to be construed in accordance with a common meaning that use is an important factor in determining classification, even under an AO nominee provision. Let me ask you about that because it seems to be clearly that's the heart of the case. And I mean, the district court was, the CIT judge was driven to what you may call an extreme position. But we want to keep some distinction between use provisions and not. And so I'm looking for what the limiting principle is, if there is one, on the use of use in the e-nominee context. Use is important for two reasons in this case. First, use can be part of an AO nominee common meaning. For example, in Lenron, where this court found, affirmed the trial court in finding that the And indeed, this court said, to be classified under the AO nominee provision, then in this case, it would have to be the predominant use. But it doesn't convert the AO nominee to a use provision. Certainly not. It's giving the common meaning, the proper common meaning, to the AO nominee tariff term. And secondly, Can you think of an example beyond Lenron? In this case, we have backpack in Camelback, where this court talked about how use was an important factor in an AO nominee provision. Citing to Quan Quan, where it talked about We'll leave Quan Quan to one side, because you're citing Quan Quan for your second meeting. So you put Camelback in the vanity case line of cases, right? Certainly, backpack is a back designed to use carrier personal effects. If you cut off the use component of these AO nominee terms, vanity case would simply be any small case. And just like when you cut off for use in wood from other wood screws, now you're left with just essentially screws. And that's why you get overlapping provisions here in a GRI 3C analysis. Okay, so anything more about the limiting principle that you think we need to talk about? What's the second? You refer to these two provisions on page 15 in your brief, right? Yes, the two provisions are other wood screws and self-tapping screws. And what's the second use in paramount importance in determining what it is? What does that mean? Certainly, when you're classifying merchandise, as this court said in Camelback, in addition to looking at things like physical size, features, uses of paramount importance to understanding what an item is for purposes of proper classification. And that's even more important here. We have an AO nominee term that incorporates a use component. So that's what you think Kwan Kwan is? I believe Kwan Kwan says that... Can you give that to me again, though? Articulate it to me again. Kwan Kwan? No, the second limiting principle on when we use use in the AO nominee concept. The first one being when the common meaning itself has a use component. And second, in classification, not under just AO nominee provision, but all provisions, you have to look at the use of merchandise to understand what it is and where it falls within the tariff schedule. Is that a fact question? Yes, it is a fact question. Because ordinarily, when you're trying to determine what the classification means, that's a legal question. Yes, Your Honor. So if we say, OK, what this means is X, then we ask whether or not this particular product fits X. Yes, Your Honor. So you had baskets in Kwan Kwan. Yes, Your Honor. AO nominee for baskets. And the accused device was, according to Judge Rich, a basket. He said so. It can be used as a basket. But it, in fact, wasn't being used as a basket. It was being used as a part of a piece of furniture. Certainly, in all classification cases, you have to determine the scope of the heading. Right. But when you're making that second step to say, well, is this thing a basket, yes or no, then that's a fact question. Yes, Your Honor. So what Judge Rich was doing in the CCPA was saying he's going to decide the fact issue that in that case, the accused devices were not baskets. They were pieces of furniture. Yes, Your Honor. That is true. That goes to the second. Once you determine the scope of the heading, it's a factual question as the feature is used to figure out under which provision it falls. In that case, the facts were a dispute. In this case, they're not. There is no dispute in the facts. We're not looking at any factual issues here. No, Your Honor. To put this case in Kwan Kwan's setting, we would be saying, well, somebody comes along and says, I think it's a self-tapping screw. And we say, no, no, no, it's not a self-tapping screw. It's a wood screw. As a matter of fact, on the second step, assume that it was agreed that the proper classification was a self-tapping screw. And I assume, I guess you would look to the fact... Then in this case, the employer would come along and say, well, it's not a self-tapping screw. Yes, you would look to the intended use. It's used for wood. So therefore, on the second step, as a matter of fact. Yes, Your Honor. There's no dispute as to the facts of the features of these screws, the intended uses of these screws, which put them squarely within... Which case is this? Is this a number one case? Is this a Lenron case? Or is this a Kwan Kwan fact? This is both, Your Honor. First, the court undertook a common meaning analysis,  It made fact determination as what the features of these screws and the intended uses of these screws are. But the step two, the Kwan Kwan fact test, we would have to be saying, we rule as a matter of fact that these things are wood screws and are not self-tapping screws. I don't know if I follow you. How would you apply this second step of the fact analysis to the facts of this case? You would have to look to determine whether the screws at issue are indeed intended primarily for wood use. And those facts are not in dispute. They're not in dispute as to the features of the R4 screw, the RT or fin trim. There's no dispute as to what these features are for. And there's no dispute as to the intended purposes of these screws. So once the common meaning of other wood screws is properly determined to be, as the dictionaries and the other sources say, screws primarily for use in wood. What were the grounds that Judge Barsley used for saying she's not going to look at use? She said this is an AO nominee provision and not a use provision. And any consideration of use would be improperly converting an AO nominee provision into a use provision. Didn't she say I'm not going to pay attention to the previous case law? Certainly, she said she was not going to follow the Customs Court case. But even putting the Customs Court cases aside, you still have the run of the mill classification case. And the first step in any classification case is determining the common meaning of the tariff terms. Well, in fairness, I think, she cited Carl Weiss, right? Yes, Your Honor. And the quote is that you shouldn't read a use limitation into an AO nominee provision unless the name itself inherently suggests a type of use. Here we have other wood screws. And unless that means screws made of wood, it has to mean screws for use in wood. So you're saying that ought to be the limiting. I mean, this is the limiting principle, right? You don't take issue with the fact that you don't look at use in an AO nominee unless the name itself inherently suggests a type of use? Certainly, Your Honor. This is the exception to Carl Weiss. You agree with her statement of the law? Generally speaking, AO nominee for the tariff terms don't incorporate use unless the term itself infers a use. Like here, you have other wood screws. Well, is that what was happening in the vanity case case, Lenron? In Lenron, I'm sorry, Your Honor. Well, you've told me earlier this is a Lenron case. No, my point with Lenron is that there is nothing absurd about having an AO nominee common meaning incorporate an intended use. Well, is that what you're saying should happen here? Yes, Your Honor. If you look at the dictionary definitions cited by the court itself, universally they talk about an intended use in wood. If you look at the industry materials. So you're saying this case satisfies Carl Weiss? Absolutely, Your Honor. And once you've determined the proper scope of the term of the wood screws, it's clear that the screws here fit that. Well, even if you're right, I mean, I think what's troubling Judge Clevenger a little, and I agree, is that it seems like Lenron and also ChemEvap may have gone a little beyond that limitation in terms of saying we are looking at use. Here you've got wood screws. Maybe you think that's a good, you know. Certainly. But how do you reconcile Carl Weiss with Lenron? What was going on in Lenron? Carl Weiss dealt with microscopes, and the plain argument in that case was the aonomaly provision of microscopes that covers all microscopes except those for surgical and medical use. And what Carl Weiss is talking about is you can't exclude certain microscopes from an aonomaly provision for all microscopes. And like here we have an aonomaly provision for other wood screws. You can't take the use component out of wood screws simply because of an aonomaly provision. I see my time is up. I'll reserve the remainder for rebuttal. At any event, Drayton has a question. So you were referring to the dictionaries that we relied on, but it seems to me that the record is pretty clear that the industry itself looks at these screws in terms of its physical characteristics. There are two specifications, yes, but those are not the common meaning. The industry has a glossary, B1812, which has the definition of wood screws, which talks about specifications and then ends with that are designed to produce strength in wood and other resilient materials, which is in accord with a common dictionary definition signed by the court and also in accord with the customs court's previous precedent talking about wood screws. But I seem to recall, and I'll find my citation here, that the industry classifications end up looking at these type of screws and saying that these are self-tapping because these are self-tapping screws because they're not hardened and they can also be used for sheet metal, other highly resilient materials, and wood. The screws at issue here are designed to affix, the R4 screw is certainly designed to affix non-wood materials to wood, but as the director of IFI, the International Fasteners Institute testified, the industry definition of wood screws are those designed to be anchored to wood and these clearly fit within that definition. But these screws can also anchor to sheet metal. No, they do not anchor to sheet metal. They can't. I do not believe that these... The record shows that. There's actually testimony from GRK's own 30V6 that these, when the R4 is talked about, but used for sheet metal is to affix sheet metal to wood. These aren't the type of screws that affix sheet metal to sheet metal. They're designed for thin fascia to a wooden frame of sorts. It can penetrate sheet metal. Certainly, yes, Your Honor. It does penetrate thin sheets of sheet metal to affix it to a wooden member. In the previous cases that looked at wood screws, it showed that those screws could not penetrate metal. They could not in that case. However, I'd like to point out even the dictionary definition cited by the court talking about wood screws can be used to affix wood to wood or metal to wood or metal to woodwork. Wood screws on steroids. At best, these screws are enhanced wood screws, but wood screws, nonetheless, classifiable under the AO nominee provision covering all wood screws. What do you make of the explanatory note that's applicable here and that the CIT relied on? It goes on and says that a use limitation should not be read into an AO nominee provision unless the name itself inherently suggests a type of a use. Then it goes on and talks about the statement at the end listing the materials in which they say they can't cut their own passage into thin sheets of metal. That's whether you adhere the metal to wood or not. I would imagine marble, slate, and plastics does not manifest a clear direction to limit self-tapping screws to the type of materials in which they are used. I disagree. The common meaning, as the dictionary definitions talk about, they talk about the difference between what screws are those designed to be used for wood. Otherwise, you would have two subheadings under the same heading covering the same merchandise. The explanatories are not authoritative, but they do provide guidance to the court. Certainly, the explanatory notes do not indicate that they affix thin sheet metal to wood or marble to wood. It just says they can cut their own passages through there. The limitation on those are those that are designed to anchor into wood or other wood screws. Your argument would be different if these screws could attach sheet metal to sheet metal? Then they would be sheet metal screws or, as the court talked about, Parker screws. Indeed, it would be a different scenario. But these screws are not sufficient for affixing metal to metal. Primarily, they are designed to affix, they are for anyway, thin sheet metal to wood. There is no evidence in the record and there is no recommendation from GRK that those are to be used with sheet metal. What is the difference in the physical characteristics between a self-tapping screw that can adhere metal to metal and a self-tapping screw that can adhere metal to wood? I would say that a screw that affixes metal to wood would be a wood screw. What is the physical difference? Not names. That is the problem with the use provision. We cannot deal with the names. The USHTS drives us first, the guidance drives us first to the physical characteristics. What is the difference in the physical characteristics between a self-tapping screw that adheres metal to metal and a self-tapping screw that adheres metal to wood? You would have a full threading on a self-tapping screw. They would hold metal to metal because they would have to hold the two pieces of metal together. The wood screws generally have an unthreaded portion so there is no gap between the wood and the metal. You have different types of threads, high-low threads. You have different thread angles on screws that are used for metal versus wood. For example, you have testimony that an angle under 60 degrees is good for wood but not good for metal. You could build your case and your opposition to the court's decision based on physical characteristics alone. Certainly physical characteristics, they inform what the intended use is going to be. But if you look at the court's definitions, they're overlapping definitions because wood screws can be case-hardened, self-tapping screws can be case-hardened. Doesn't the GRs drive you to look at physical characteristics first? General rules of interpretation tell us to look at the common meaning of the terms first. Then once we determine the common meaning, GRI 1 says the language is paramount. Once we determine the proper common meaning, then we look at the screw's physical characteristics, uses to determine under which provision it falls. We'll ask, what is it about the manner in which Judge Barsley views the GRs that you find was incorrect? That's how she based her entire case on. Certainly it was incorrect because she got past GRI 1 by improperly construing the common meaning of the terms. Had you had a proper construction of the terms, it would have been classification pursuant to GRI 1. It would not have gotten to GRI 3, which she concedes is supposed to be rarely used in any event. And what you have here is now two overlapping subheadings under the same heading. So for you, this really is not a case about use? It's a case about common meaning. Okay. But common meaning is informed by use. Absolutely. The common meaning of wood screws, it does have a use component, absolutely. Okay. You've gone over. We'll restore two minutes of rebuttal, and we'll add three minutes to Mr. Ziegler's time to keep things even. Good morning, Your Honors. May it please the Court, my name is Craig Ziegler, and it's my privilege to represent GRK Canada, the importer of the screws at issue here. I think where the government has gone wrong is focusing on use almost exclusively, where we have here aeonomine provisions, which, of course, this Court has said consistently, you start out on the aeonomine classification by looking at the name itself, what does the name mean, and particularly, what are the common and commercial meanings of the name as it's understood in the industry itself. You look very practically to see how, in reality, the industry considers and classifies the different kinds of screws. What we have here is we have standards published by a neutral, industry-wide standards publishing body which talk about distinguishing wood screws and self-tapping screws on the basis of physical characteristics, and use is not a part of that, at least as to self-tapping screws. The government focuses only on a definition of wood screws and says wood screws are screws used in wood, and the definition that they cite in the standard glossary of terms, that's the B18.12, talk about wood screws have certain characteristics and are generally used in wood. But the definition for self-tapping screws does not have any sort of use limitation on it. And the reason that is that self-tapping screws evolved out of wood screws. They are wood screws on steroids. They have additional physical characteristics that wood screws do not because they have to perform enhanced capabilities to perform their function, like penetrating materials that are much harder and denser than wood, like plastics, sheet metal, marble, slate, the kinds of things the explanatory notes tell us distinguish self-tapping screws from mere wood screws. And use certainly has some role to play, but it's not where you start, and it's not what you look at exclusively of everything else, like the government has been doing here. If use has some role to play, and a trial court says use has no role to play, then couldn't one think that the trial court used the wrong analytic tools? No, the trial court here did use the right analytic tools. No, but I mean, if the trial judge, as I understood it, said I'm not going to consider use, period. Because if they did that, Your Honor... You did tell me a minute ago that use is important. Use can be, in the appropriate circumstances, Your Honor, a factor to interpret what does the word mean. As Carl Zeiss, the court said to Carl Zeiss, you don't read an AONOMINE provision, you don't read a use limitation into an AONOMINE classification unless the name inherently suggests the type of use. So in an appropriate situation, where the definition of a vanity bag is... The name is wood. Well, yeah, but you look at the... That's true. That's the name. The name says wood screw. Right, and the definition of a wood screw into the standards, that B18.12, talks about a wood screw that has certain characteristics and is generally used in wood. But there's another definition for self-tapping screws, which you have to look at as well, and how the industry recognizes self-tapping screws. It's by their physical characteristics, which means they're case-hardened, heat-treated and case-hardened to make them harder so that they can satisfy minimal torsional strength requirements so they don't snap off when they're driven into hard and dense materials. That they have additional physical characteristics that wood screws don't have, and that's the distinguishing characteristic. So use might be a factor in understanding what wood screws are, but it's not... There's no limitation in the definition as to use on the definition of self-tapping screws. So that here you look at the physical characteristics, and there are certain physical characteristics that are identified in the industry-published standards that say self-tapping screws have these characteristics. They are hardened, they have... Are they fully threaded? They can be. Very short, they are fully threaded, but if they're longer, the threading varies. And again, for the wood screw standard, it says the threading is always two-thirds of the shank. But in the self-tapping screws, the standard allows that that area of threading can vary considerably. Again, that's a difference between self-tapping screws and wood screws. And in this case, GRK screws in particular, they can... Very short ones are threaded the whole way, very long ones, and there are some that are, you know, this long, Your Honor, where the threading is only a couple inches, less than half of the shank. And again, that does not... So in your theory, these under GR1, these are properly classified as self-tapping? That's correct. So the trial judge erred. The trial court... Well, I mean, what I'm trying to get at here, sir, is what's... I mean, the folks up in New York do this stuff all the time, and we don't. And there are, you know, hoops you have to jump through. There's a methodology you have to use. And we know that Judge Barsley said, use is not involved here. And she said it could be either one. She said it's not involved in this particular situation because... Well, and she says they're equally satisfied GR1, and you disagree with that. I disagree with that, Your Honor, and this is why. So maybe we ought to say let her understand that use can be relevant and let her decide whether use is relevant in this case. And if it's not relevant, as you say, she will quickly come to the conclusion that you're right and that she was wrong previously to default to a seldom, if ever, used provision. There's something wrong here. All I'm trying to say is you're telling me that she made a mistake, and your adversary is telling me she made a mistake, and you're asking us to sort it out where use may or may not be involved. I don't know. Well, here's where I think we can answer... What do you do with all the evidence about what these screws are used for? Here's where I think we can answer that question, Your Honor. What do you do with the factual record we have here? The factual record, in fact, is... These screws are used as wood screws. The factual record here is that the government improperly focuses only on one aspect of the two things that these screws are designed to connect together. They're screw fasteners that can connect one thing to another. And they focus only on what the screw is anchored into, which is mostly wood in our situation. What did your expert say at A484? I'm sorry, Your Honor? Didn't your expert say these are wood screws? No, he said that oftentimes... And that's true. They usually are. But before they get there, Your Honor, they have to penetrate something else. Before they can fasten something to that wood or whatever else they're going to be anchored into, which could be other things besides wood. It could be... That is true, Your Honor. But they can also be used not only in anchoring wood, but anchored into man-made materials that are not wood. Man-made composite decking material, which is mostly sawdust, wood and resins, which are much harder... Does that make them non-wood screws? Yes, it does, Your Honor. Why? Because you have to look at both what they anchor into and also what they have to penetrate first. Wood screws covers all varieties of wood screws, including screws of wood that can go into metal. But you have to understand, there's also a deposition of self-tapping screws. And the industry out there recognizes... If you have a screw that's going to go through very hard wood, like EPEG in Brazil, it's going to go through a tiny piece of tin, too. You know that. Exactly. But that doesn't make it a self-tapping screw. But a wood screw won't go through the EPEG, Your Honor, because it's too hard. A wood screw goes through what we consider wood, like maple, cherry, that kind of thing. But what we have here, Your Honor, is... I don't know a wood screw wouldn't go through EPEG. Well, it's just too hard, Your Honor. It doesn't. It's a hardened wood screw. But the point, Your Honor, is that... And it's got all of the indications of a wood screw. But, Your Honor, self-tapping screws have more than that, because they also can penetrate other materials, as the explanatory notes identify. And you have to penetrate those materials before you can anchor it into anything. So you have... They can penetrate the sheet metal. They can penetrate marble, plastic, slate, which are not wood materials, not fibrous materials. And the other thing, too, is if you look at the definitions of wood screws versus self-tapping screws in terms of physical characteristics, wood screws, the definition in the standards, talk about wood screws being thread-forming screws. They form their mating threads by compressing the material around them. Did Judge Barclay make a mistake in how she interpreted what wood screws are? Because she set up a definition for both wood screws and self-tapping screws. Yes, she did. And her definition isn't exactly what you're telling me the industry said. I was trying to find out how many more mistakes she made  The mistake that Judge Barclay made, Your Honor, was that she identified in page 22 of the opinion certain characteristics of self-tapping screws, which we agree with. Then she went on to say, but these screws here also satisfy certain characteristics of wood screws. And that's also on page 22 of the opinion. But the point is that the characteristics of wood screws are not unique to wood screws. And that's where she went astray. Because obviously if a screw is hardened sufficiently and has the torsional strength requirements to penetrate very hard and dense materials like plastics and sheet metal and marble and those kinds of things, well, of course it could also anchor into wood. Well, a self-tapping screw would go through wood. Well, of course. Because it's softer than the material that the self-tapping screw is designed to penetrate. A self-tapping screw would go through concrete and it would go through wood. Well, yes. In an e-paste. Yes, exactly. Exactly, Your Honor. So it's really the characteristics that allow the self-tapping screw to penetrate those harder and denser materials that wood screws can't, that transform these into something other than wood screws. There's something beyond that. A new E.O. Nominate classification called self-tapping screws. And you have to understand, and we've heard this in our brief, self-tapping screws have evolved out of wood screws. It's part of the heading that says wood screws that are self-tapping. You could have said that, Your Honor. Yes. And really, given the history and recognizing commercial reality. The HTS, it's obvious it can't cover every product in the world. Even though it's three big fat volumes, it can't cover it. Right. So, and to get a classification, to create a new classification is pretty difficult because we have a harmonized schedule with the rest of the world. So it's not a good answer, I think, to say, yeah, there could be another one just for this particular product. But what happened here, Your Honor, is that back in the old, before the harmonized tariff schedules, you had HTS. Right, the HTS. We only had wood screws and other screws. There were no self-tapping screws. There were no self-tapping screws. It was what we would now call a self-tapping screw with an other screw. And all the cases dealing with wood screws that were decided under the HTS-US, those were screws that were not hardened. That's correct. That's correct, Your Honor. And the two cases that were cited by everybody here. And another thing is, after that, the GRs changed from the HTS-US to the current tariff schedule, correct? Correct, Your Honor. Let me ask you this question. We're talking a lot about use. Isn't there a difference, like a term of art, when you say intended use versus just merely use? Doesn't intended use go to the good at a state of importation to describe it at the time of importation? That's what the court said. I'm not going to rely on it. Intended use does, obviously, you look at what the intended use is at the time of importation. You can't tell how it's actually going to be used, obviously. And I think, to be fair, what the court below really said was that use isn't helpful here. I mean, use can be a factor in looking at an aonomenae classification in appropriate circumstances. Carl's eyes tell us, you know, be careful. Don't convert an aonomenae into a use provision unless the name itself suggests that. But it can be useful, but maybe not here when we have industry-wide published standards that focus on physical characteristics that just differentiate wood screws from self-tapping screws. And what you have here is those additional physical characteristics that, you know, and part of the problem is that, as the explanatory notes say, self-tapping screws resemble wood screws because they evolved out of them. Why doesn't the name here suggest use? Why doesn't the name wood screw suggest use? It does. And if you look at the definition of wood screw... It suggests use in wood. That's correct. And if you look at the definition of wood screw in the standard glossary of terms, which would be 18.12, it talks about having certain kinds of heads, certain kinds of points, and generally used in wood or other resilient materials. And that's true for a wood screw. But the self-tapping screw, there's a definition of that as well in the standards. And that definition does not talk about use. It doesn't talk about used in wood or used in metal or anything like that. It's not limited that way. If she had properly done her case here, she would have said, according to you, I'm not going to violate Carl Zeiss. I'm going to say in this particular case, when construing the wood screw provision, I'm going to say use is implied. And I'm going to look at what the standard definition of wood is. And I'm going to say, well, for a wood screw, use is involved. Correct. Not what she said. Correct. Like, hello. Not at all what she said. But that would have been if she'd done it correctly. And then she would have said, well, I realize all of that. But self-tapping screws don't have any use limitation. So I'm now going to have a definition for self-tapping screw. And I'm going to come up with it, right? Well, and she did. And so then she has to say, well, now I've got to decide whether these two and whether the goods are equally classifiable under either. Right? Because she can't get to GR3 and then 3 to the basket without that. Right. But she would not have said that these screws are equally classifiable under both wood, correctly interpreted with use involved. Huh? Because she would have said these are self-tapping screws. That's where she went awry, in our view, Your Honor. But if we were to write that opinion and match that opinion up against her opinion and ask any first-year law student whether there's any difference between the two opinions, they would all say, there is a world of difference. Yes, that's correct, Your Honor. And obviously, this court looks at. All I'm just wondering is whether, out of courtesy to this very fine judge, the fine judge ought to have an opportunity to hear these arguments the first time instead of us. All the mistakes she made. This court could conclude that, Your Honor, obviously. You're not saying that the court erred in the classification. You're just saying maybe she got there differently than what you would have. Well, obviously, if this court wants to refer on the basis of the Thor Court, my client will go home happy. But obviously, I think. This could be a harmless error, I mean, from your point of view. That's true, Your Honor. But I think, to be fair, and since this court looks at these questions de novo, it applies the law in a plenary review kind of situation. We can agree with you and write the opinion and say, Judge Parsley, you were wrong. And since it's important to have a precedential opinion, these screws have been lying around since, what, 2008? Before that, Your Honor. It was before that. But these particular ones, yes. So you've got millions of screws all tied up waiting for a proper classification. That's correct, Your Honor. And there are a lot of other people in the screw business, too, right? Yes, Your Honor. So they would like to know what the correct analysis is, right? That's true. Ordinarily, they get it from the Court of International Trade. However, the facts are here of record that this court could make that decision without sending it back to the Court of International Trade, because the evidence, the facts of record, is that these screws, although, yes, they can be anchored into wood, but to do that, they first have to be able to penetrate the kinds of hard and dense materials that wood screws can't, plastics, sheet metal, slate, that kind of stuff. Those facts are of record. And this court can apply the law in a plenary fashion as well as the Court of International Trade can do and issue a presidential opinion that'll help the analysis. And when you look at that, when you look at what physical characteristics distinguish and separate these particular screws from wood screws, they're clearly self-tapping screws. And the court, I think, where they went wrong, she went wrong. She talked about, on page 22 of her opinion, the physical characteristics that make self-tapping screws self-tapping screws. And we satisfy all of those. Then she went on to say, but they also share some characteristics with wood screws, which is true. But the characteristics of wood screws she identified in that same page, 22 of the opinion, are not unique to wood screws. Yes, they describe wood screws to some extent, but they're not unique to wood screws. Self-tapping screws share those qualities as well, because necessarily, if they can penetrate hard materials, they can penetrate soft materials like wood as well. So that's where the court went wrong. Thank you. Thank you very much, Your Honor. Just very briefly, Your Honor, this is a common meaning error. The common meaning of wood screws, it seems everyone understands, incorporates an intended use. And that intended use is the primary purpose for anchoring it to wood. These screws, all their features are specially designed to fulfill that function from their self-countersinking head. Wait, wait, wait. Are you disagreeing with your adversary saying, well, the judge here made some mistakes in the analysis. He's saying, well, these are no question about wood screws. The wood screw provision is limited by use. That's what he just said. That's your argument, right? Yes, Your Honor. But he said you can't win, because we now have to go over and have a correct interpretation of self-tapping screws. We've got a correct determination of self-tapping screws. And then we ask, well, what are these screws an issue? Which ones are they? I disagree. The court got the correct analysis for self-tapping screws as well, because it is also informed by use. If you look at the dictionary definition cited by the court for the term self-tapping, they all refer to anchoring to things like metal, which would otherwise require tapping or bolting. But is it your argument that the classification was incorrect, because you start off with a common understanding of the name? Yes, common meaning. So let me ask you a question. We're talking about wood screws. Have you ever seen a wooden screw? No, Your Honor, I have not. No, I have. I mean, with a baby play set? You know, a construction set? Yes, Your Honor. Those are wood screws. Certainly, but he has talked about wood screws. So how do you get beyond that? The explanatory notes and the dictionary definition all talk about metal screws designed to anchor to wood. So it's not just a common name. I mean, you may start there. In fact, you start there to find out which chapter of HDS you need to go to. And then after that, you drop down and you start the classification analysis with the GRs.  You start with GR1 and you determine the common meaning of the terms. That's GR1. And then after GR2 is the physical characteristics? GR2, I believe, is unfinished goods, Your Honor. The GRIs are applied in numerical order. First, you look at the terms of the heading. Sorry, my time is up. But the killer erred on common meaning and this case needs to be reversed. Thank you. We thank both counsel. The case is submitted. That concludes our proceedings this morning. All rise.